## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Sean Rafferty, being duly sworn, depose and state as follows:

## AGENT BACKGROUND

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I have been a Special Agent with the Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") since December 2002. I am currently assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force in Watertown, Massachusetts, along with agents from other federal, state, and local law enforcement agencies, including the U.S. Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation ("FBI"), and the Massachusetts State Police ("MSP"). Since becoming a Special Agent with HSI, I have conducted numerous investigations of unlawful drug distribution and importation in violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960 and 963, the laundering of drug proceeds in violation of 18 U.S.C. §§ 1956 and 1957, and have conducted and participated in wiretaps, physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants and witnesses and reviewed recorded conversations, telephone, financial records and drug records.

3.      In 2003, I graduated from the Federal Law Enforcement Training Center, Criminal Investigator Training Program, and the United States Customs Service Academy, Customs Basic Enforcement School. I have a Bachelor of Science degree in Accounting Information Systems

from Bryant College, Smithfield, RI, and a Master's degree in Criminal Justice from Western New England College. I have attended the DEA Narcotics Investigator training, DEA Telecommunication Training, DEA Highway Interdiction Training, DEA Jetway Interdiction Training, ICE Asset Forfeiture and Financial Investigations Training, and the ICE Conducting Title III Intercepts Training. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs. Through my training, education and experience, I have become familiar with the manner in which narcotic proceeds are laundered both domestically and internationally.

4. I have written and/or participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding narcotics trafficking organizations. I have received extensive specialized training in the field of controlled substance identification, investigation and enforcement.

## PURPOSE OF AFFIDAVIT

5. I submit this affidavit in support of a Criminal Complaint charging James DE LA CRUZ, a/k/a "Jay" and Juan SANTOS ROQUE with violating Title 21, United States Code,

Section 846 (conspiracy to distribute and to possess with intent to distribute more than 400 grams of fentanyl) (the "Charged Offense").

6. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral reports made to me by agents of HSI and other federal, state, and local law enforcement agencies.

4. This Affidavit is submitted for the limited purpose of establishing probable cause to believe that DE LA CRUZ and SANTOS ROQUE have committed violations of the Charged Offense. Accordingly, I have not included each and every fact known to me and other investigators involved in this investigation. I have set forth only the facts that I believe are needed to establish probable cause.

## PROBABLE CAUSE

*Initial Introduction to James De la Cruz*

5. Beginning in September 2019, a confidential source[1] (hereinafter, "CS-1"), advised HSI agents that he was in contact with a Mexican drug trafficking organization. CS-1 began communicating with an unidentified individual he understood to be a Mexican national involved in the drug trafficking organization (hereinafter, "UI-1") through text messages on WhatsApp at telephone number 52-662-139-4625. At the direction of investigators, CS-1 told UI-1 that he was interested in purchasing "synthetic," meaning fentanyl, and "original," meaning heroin. Based on experience and training, investigators know that "synthetic" is a street name for fentanyl and "original" is a street name for heroin. UI-1 told CS-1 that he was going to pass CS-1's telephone number to his "boy," a drug courier located in New York. UI-1 asked CS-1 how many "cars,"

---

[1] CS-l has been working as a confidential source for HSI since 2018 and has provided information leading to the seizure of kilogram quantities of narcotics. CS-l is illegally in the United States and is working in consideration for possible immigration benefits. CS-l has a prior conviction for drug distribution. Information received from CS-1 is believed to be reliable.

3

meaning kilograms of drugs, CS-1 wanted to purchase each month. CS-1 told UI-1 that he would need "10" each month, meaning ten kilograms. UI-1 told CS-1 that he wanted CS-1 to meet with the drug courier.[2]

6. On September 23, 2019, DE LA CRUZ called CS-1 at the telephone number provided by UI-1. CS-1 returned the call to DE LA CRUZ at DE LA CRUZ's telephone number (646) 874-6270. CS-1 told DE LA CRUZ that by next Friday, CS-1 would have enough money to purchase "10," meaning 10 kilograms of fentanyl, but if they waited another week, CS-1 would be able to purchase "a couple more," meaning additional kilograms of fentanyl. DE LA CRUZ told CS-1, "I got to talk to you first bro, it's not just like going to the supermarket and getting a couple of waters." DE LA CRUZ informed CS-1 that he wanted to meet in person before doing business. CS-1 told DE LA CRUZ that he would call him the next day.

7. Later in the evening on September 23, 2019, DE LA CRUZ called CS-1. DE LA CRUZ asked CS-1 where he was from and if he was Spanish or white. CS-1 informed DE LA CRUZ that he was not Spanish and has been doing this a long time, meaning drug trafficking. DE LA CRUZ informed CS-1 that they could start off by meeting each other. CS-1 told DE LA CRUZ that he would call DE LA CRUZ the next day to set up a meeting.

*October 3, 2019 Meeting Between CS-1 and DE LA CRUZ; DE LA CRUZ Provides Samples of Heroin and Fentanyl*

8. On September 25, 2019, CS-1 called DE LA CRUZ to arrange a meeting for the following Tuesday, October 1, 2019. On September 30, 2019, CS-1 called DE LA CRUZ and changed the meeting to Thursday, October 3, 2019. On October 2, 2019, CS-1 provided DE LA CRUZ with the name and address of the meeting location, Stockyard Restaurant, 135 Market Street,

---

[2] The courier was identified as James DE LA CRUZ at his arrest on October 21, 2019 described in detail below. For the remainder of this affidavit, I refer to him as DE LA CRUZ

4

Boston, Massachusetts. DE LA CRUZ informed CS-1 that he was in the Bronx and would leave around 9:00 a.m. DE LA CRUZ told CS-1 that it would take him three hours to get to the meeting location.

9. On October 3, 2019, prior to meeting with DE LA CRUZ, CS-1 and another confidential source[3] (hereinafter, "CS-2") met with investigators at a predetermined location. Investigators searched both CS-1 and CS-2 for contraband and currency with negative results. Investigators equipped both CS-1 and CS-2 with recording devices. Investigators then surveilled CS-1 and CS-2 to the meeting location at the Stockyard Restaurant in Boston.

10. At approximately 12:20 p.m., investigators observed a gray Honda Accord, bearing New York Registration JEH969, being driven by DE LA CRUZ, pull into the parking lot of the Stockyard Restaurant in Boston. At approximately 12:37 p.m., CS-1 and CS-2 arrived at the meeting location and met with DE LA CRUZ in the parking lot. Investigators then observed CS-1, CS-2, and DE LA CRUZ enter the restaurant. Once inside the restaurant, in lightly coded language, CS-1, CS-2, and DE LA CRUZ discussed the purchase of kilograms of heroin and fentanyl. During the meeting, DE LA CRUZ stated his name was "Jay" and informed CS-1 and CS-2 that he was the boss in New York. DE LA CRUZ informed CS-1 and CS-2 that he would bring some "stuff," meaning drug samples, up to Boston the next time he met with CS-1 and CS-2. DE LA CRUZ informed CS-1 that the purchase price for one kilogram of fentanyl or heroin was $40,000 and that UI-1 set the price.

11. In recorded telephone calls and text messages after the October 3, 2019 meeting, CS-1 and DE LA CRUZ arranged a meeting for October 8, 2019. CS-1, CS-2, and DE LA CRUZ

---

[3] CS-2 has been working as a confidential source for HSI since 2018 and has provided information leading to the seizure of kilogram quantities of narcotics. CS-2 is illegally in the United States and is working in consideration for possible immigration benefits. CS-2 has a prior conviction for drug distribution. Information received from CS-2 is believed to be reliable.

planned to meet in the parking lot of the North Shore Mall in Peabody, Massachusetts. Prior to this meeting, CS-1 and CS-2 met with investigators at a predetermined location. Investigators searched both CS-1 and CS-2 for contraband and currency with negative results. Investigators also outfitted CS-1 and CS-2 with recording devices. Investigators then surveilled CS-1 and CS-2 to the meeting location.

12. At approximately 2:59 p.m., CS-1 and CS-2 arrived at the meeting location near the Cheesecake Factory Restaurant. At approximately 3:17 p.m., investigators observed DE LA CRUZ arrive at the meeting location in his gray Honda Accord, bearing New York Registration JEH969. Investigators observed CS-1 and CS-2 enter DE LA CRUZ's vehicle. Once inside the vehicle, DE LA CRUZ provided CS-1 with samples of heroin and fentanyl. The fentanyl sample was white powder wrapped in a clear plastic bag weighing 3.2 grams with packaging. The heroin sample was brown in color and was packaged in a clear plastic bag weighing 2.7 grams with packaging. CS-1 and CS-2 then exited the vehicle and returned to the predetermined location to meet with investigators.

13. Once at the predetermined location, CS-1 turned over the drug samples to investigators. Investigators field tested the two drug samples provided to CS-1 by DE LA CRUZ. The white powder sample tested positive for the properties of fentanyl and the brown powder sample tested positive for the properties of heroin.

*Arrangements between CS-1 and* DE LA CRUZ *for Large Drug Shipment of Heroin and Fentanyl from New York to Massachusetts*

14. On October 10, 2019, CS-1 called DE LA CRUZ's new telephone number (646) 698-1163. CS-1 told DE LA CRUZ that he was ready and liked the "original and the other one too." Investigators understood this to mean that CS-1 liked both the heroin (original) and the other one (fentanyl). In lightly coded language, CS-1 told DE LA CRUZ that he would be ready next

Wednesday, October 16, 2019, for the drug shipment. DE LA CRUZ asked how he should make the delivery. CS-1 explained that he wanted to grab it and go when they met. CS-1 told DE LA CRUZ that he would let him know how much, meaning drug quantity, he needed the next day based on the amount of money he had.

15. On October 12, 2019, CS-1 called DE LA CRUZ and told DE LA CRUZ that he had enough money for 11 of the "cars," meaning kilograms of narcotics. DE LA CRUZ asked CS-1 if it was 11 of the "original," meaning heroin or "the other one," meaning fentanyl. CS-1 told DE LA CRUZ that he would let DE LA CRUZ know the breakdown. DE LA CRUZ informed CS-1 that he had six "original," meaning six kilograms of heroin, and "11," meaning 11 kilograms of fentanyl. CS-1 told DE LA CRUZ that he would call DE LA CRUZ the next day to confirm the delivery amount and breakdown.

16. On October 13, 2019, CS-1 called DE LA CRUZ and told him that he had the money for 11, meaning 11 kilograms of heroin, and five of the "other one," meaning fentanyl. DE LA CRUZ told CS-1 he had "10," meaning fentanyl and "six original," meaning heroin. CS-1 told DE LA CRUZ that he would take them all. Based on experience and training, investigators understood this exchange to mean that CS-1 planned to purchase ten kilograms of fentanyl and six kilograms of heroin.

17. On October 14, 2019, CS-1 called DE LA CRUZ. DE LA CRUZ asked CS-1 if he was going to take them all. CS-1 informed DE LA CRUZ that he would buy all of them. DE LA CRUZ told CS-1 it was "10," meaning ten kilograms of fentanyl, and "six originals," meaning six kilograms of heroin. DE LA CRUZ told CS-1 to give him the address and time to meet. Investigators understood this exchange to mean that CS-1 was confirmed to purchase ten kilograms of fentanyl and six kilograms of heroin.

18. A few minutes later, DE LA CRUZ called CS-1 and told CS-1 that he had a quick question. DE LA CRUZ asked CS-1 if he liked the narcotics in "squares." CS-1 stated "yeah." Based on experience and training, investigators understand "squares" to mean packaged kilogram-quantity bricks of drugs. The two then discussed the different methods of packaging the fentanyl and heroin.

19. On October 15, 2019, CS-1 called DE LA CRUZ and asked if they were still "good" for tomorrow. DE LA CRUZ asked what time they would be meeting and CS-1 stated between 1:00 p.m. and 2:00 p.m. CS-1 told DE LA CRUZ to head to the same place as last time. DE LA CRUZ asked CS-1 if that was the "Cheese Factory," meaning the Cheesecake Factory. CS-1 confirmed that was the location. DE LA CRUZ asked CS-1 about meeting between 4:00 p.m. and 5:00 p.m. CS-1 and DE LA CRUZ then agreed to meet between 3:00 p.m. and 4:00 p.m. DE LA CRUZ asked CS-1 if it was still going to be "16" in total, meaning 16 kilograms of narcotics. CS-1 confirmed that was correct and that he would see DE LA CRUZ tomorrow.

20. On October 16, 2019, DE LA CRUZ called CS-1 and asked if they could leave the "original" for Monday and the "other for today," meaning DE LA CRUZ would transport six kilograms of heroin to Boston on Monday (10/21/19) and ten kilograms of fentanyl to Boston that day (10/16/19). CS-1 asked if they could simply do the entire shipment on Monday (10/21/19). DE LA CRUZ agreed that he would. DE LA CRUZ explained to CS-1 that the person who controls the location where the "original" (heroin) was stored was not there that day. CS-1 told DE LA CRUZ that he would call DE LA CRUZ back. CS-1 called DE LA CRUZ back and told DE LA CRUZ that it was too dangerous to make two trips and they should complete the entire transaction on Monday (10/21/19) for the six kilograms of heroin and ten kilograms of fentanyl. DE LA CRUZ

agreed and stated he would be there, meaning Massachusetts, between 2:00 p.m. and 3:00 p.m. on Monday (10/21/19).

21. On October 18, 2019, CS-1 called DE LA CRUZ and the telephone call went to voicemail. DE LA CRUZ called CS-1 back. CS-1 asked DE LA CRUZ if everything was ready, meaning the drugs were ready for delivery on Monday (10/21/19). DE LA CRUZ stated, "We are good bro." CS-1 told DE LA CRUZ that he would call DE LA CRUZ on Sunday (10/20/19) and see DE LA CRUZ on Monday (10/21/19).

22. On October 20, 2019, CS-1 called DE LA CRUZ and the call went to voicemail. CS-1 called DE LA CRUZ again and DE LA CRUZ told CS-1 that "everything good." DE LA CRUZ informed CS-1 they would be meeting between 2:00 p.m. and 3:00 p.m. CS-1 told DE LA CRUZ to call him the following day.

*DE LA CRUZ and SANTOS ROQUE Transport Ten Kilograms of Suspected Fentanyl and Six Kilograms of Suspected Heroin to Massachusetts*

23. On the morning of October 21, 2019, CS-1 called DE LA CRUZ and the call went to voicemail. CS-1 called DE LA CRUZ again and DE LA CRUZ told CS-1 that he was three hours away from Massachusetts. CS-1 asked DE LA CRUZ if he would be "here," meaning Massachusetts, at 2:30 p.m. DE LA CRUZ said, "Yeah," and told CS-1 that his driver would be there sooner than he would. DE LA CRUZ explained that he had a separate driver. Investigators understood "driver" to mean the person who would be driving the narcotics in a separate vehicle. DE LA CRUZ asked CS-1 if it would be better to meet at a hotel. CS-1 agreed and said he did not want to talk too much on the phone. CS-1 told DE LA CRUZ that he would call him when he was ready.

24. On October 21, 2019, at approximately 1:53 p.m., your affiant, while posing as CS-1, sent a text message to DE LA CRUZ stating, "Call me man." DE LA CRUZ called CS-1 and

9

told him that he was 17 minutes away. CS-1 told DE LA CRUZ that he would text him the address of the hotel when DE LA CRUZ was 10 minutes away. In lightly coded language, CS-1 asked DE LA CRUZ if he had to meet with his "guy" first, meaning the "driver" transporting the narcotics. DE LA CRUZ stated that they were all going to meet "there" together, meaning the hotel address that CS-1 was going to text DE LA CRUZ. At approximately 2:04 p.m., DE LA CRUZ texted, "Text it," to CS-1, meaning that CS-1 needed to text the address of the hotel where they were going to meet. DE LA CRUZ then called CS-1 and said he was waiting on the text. While posing as CS-1, your affiant texted DE LA CRUZ the meeting location, "Marriot 8a centennial drive Peabody ma."

25. Prior to meeting with DE LA CRUZ and his driver, CS-1 met with investigators at a predetermined location. Investigators searched CS-1 for contraband and currency with negative results. Investigators also outfitted CS-1 with recording devices. Investigators then surveilled CS-1 to the meeting location.

26. At approximately 2:25 p.m., CS-1 met with DE LA CRUZ in the parking lot of the Marriot Hotel, 8A Centennial Drive, Peabody, Massachusetts. DE LA CRUZ parked on the side of the hotel and walked over to CS-1's vehicle. Investigators also observed a female in DE LA CRUZ's vehicle. DE LA CRUZ then entered the front passenger seat of CS-1's vehicle. DE LA CRUZ received a telephone call and told CS-1, "He said 11 minutes," meaning his driver was 11 minutes away from the hotel. DE LA CRUZ told CS-1 that one of the "original" was missing "150," meaning one of the heroin packages was missing 150 grams out of 1,000 grams. DE LA CRUZ stated he could give CS-1 $6,000 back because there was only "850," meaning only 850 grams in one of the heroin packages instead of the full 1,000 grams. DE LA CRUZ explained that there was "16," meaning 16 total kilograms of heroin and fentanyl, but one package was missing

150 grams. CS-1 told DE LA CRUZ to make it up to him next time and he was not worried about $6,000.

27. At approximately 2:41 p.m., a silver Mercedes Benz, bearing New Jersey license plate 474808R, arrived and parked next to CS-1's vehicle. The Mercedes was driven by Fatima Almonte and investigators observed Juan SANTOS ROQUE seated in the left rear passenger seat of the vehicle.[4] DE LA CRUZ and CS-1 walked over to the Mercedes. CS-1 got into the right rear passenger door of the vehicle and sat with SANTOS ROQUE in the back seat. DE LA CRUZ sat on the back steps of the Marriot Hotel next to the Mercedes. SANTOS ROQUE then removed multiple square brick-like packages of suspected narcotics wrapped in either black duct tape or clear plastic wrap from a hidden compartment behind the arm rest in the middle of the back seat. With assistance from CS-1, SANTOS ROQUE placed the square packages of suspected narcotics in a shopping bag on the floor of the back seat. CS-1 and SANTOS ROQUE counted 16 brick-shaped square packages in the bag. After counting out 16 packages, CS-1 told SANTOS ROQUE and DE LA CRUZ that he was going to get the money. CS-1 then called investigators and said "16," meaning kilograms of narcotics, were in the car.

28. At approximately 2:46 p.m., investigators moved in and arrested DE LA CRUZ and SANTOS ROQUE. Investigators observed a shopping bag on the floor in the back seat of the Mercedes Benz which contained 16 square packages wrapped in either black duct tape or clear plastic wrap. Investigators field tested the substances in two of the packages wrapped in black duct tape and one of the packages wrapped in clear plastic wrap. The substance wrapped in clear plastic and the substance in one of the packages wrapped in black duct tape tested positive for fentanyl. The other substance wrapped in black duct tape tested positive for heroin. Each of these tested

---

[4] Almonte and SANTOS ROQUE were identified by investigators after investigators moved on scene and took the participants into custody.

packages weighed over one kilogram with packaging. Based on my experience and training, the physical appearance of the packages, and discussions between CS-1 and DE LA CRUZ leading up to this arrest, investigators believe that the 16 packages in the vehicle contain approximately 16 kilograms of narcotics, six kilograms of heroin and ten kilograms of fentanyl.

## CONCLUSION

29.     Based upon the foregoing, there is probable cause to believe that on October 21, 2019, DE LA CRUZ and SANTOS ROQUE did commit violations of the Charged Offense.

I declare that the foregoing is true and correct.

_____
Sean Rafferty
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me, October __22__, 2019.

_____
Honorable Jennifer C. Boal
United States Magistrate Judge
District of Massachusetts